IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF the Verizon (530) 739–8909 cellular telephone belonging to Sophia Ritachka to be seized during the suspect interview of Sophia Ritachka | MJ-22- 06 -H-TJC |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Burningham, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41. This affidavit supports applications for the search of a Verizon cellular phone (530) 739–8909 belonging to Sophia Ritachka to be seized on August 26, 2022, during a suspect interview with Sophia Ritachka. The applied for warrant would authorize the forensic examination of the Device identified in Attachment A, for the purpose of identifying electronically stored data particularly described in Attachment B.

2. I am a Special Agent (SA) of the United States Forest Service (USFS) and am currently assigned to Helena, Montana. I am conducting an Archeological Resource Protection Act (ARPA) investigation involving 16 U.S. Code § 470ee - Prohibited acts and criminal penalties. I have been employed as a SA with the

USFS for five years. As a Federal Agent, I am statutorily charged with investigating federal criminal violations, authorized to investigate violations of laws of the United States and authorized to execute warrants issued under the authority of the United States. I have been an investigative case agent involving federal law violations including arson, ARPA, environmental crimes, assault on a federal officer, firearms offenses, sex crimes, narcotics offenses, and financial crimes. Prior to working as a SA for the USFS, I worked as a SA for the United States Air Force Office of Special Investigations for two years. In this capacity, I worked cases involving fraud, sex crimes, assault, homicide, counterintelligence, and narcotics.

3. As a Special Agent of the USFS and of AFOSI, I have had training and experience dealing with multiple criminal investigations involving the use of investigative methods related to electronic, computer, and Internet-based crimes. I have participated in training related to electronic based crimes and investigative techniques. I am familiar with and have participated in the normal methods of investigation, including but not limited to, the general questioning of witnesses and suspects, the review of phone and computer records, physical surveillance, and the detection and collection of evidence. I have investigated crimes involving electronic evidence, emails, text messages, and the Internet.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of the agency, law enforcement officers, and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that the Device contains evidence of violations of 16 U.S. Code § 470ee (a) which prohibits the unauthorized excavation, removal, damage, alteration, or defacement of archaeological resources.

## PROBABLE CAUSE

6. The information below is presented to show that Sophia Ritachka illegally damaged, altered, and defaced an archeological resource in violation of 16 U.S. Code § 470ee (a) and that evidence of this criminal activity is likely to be found within the Device.

7. On July 7, 2022, Rachel Reckin, Montana Fish, Wildlife and Parks (MFWP) Heritage Program Manager, Helena, Montana, called Mark Bodily, USFS Archeologist, Great Falls, Montana, to report that one of their river rangers, Nathan Kluz, MFWP, Great Falls, Montana, found some new vandalism at the

archeological rock art panel site 24ME0341 (Canyon Mouth Site) located on National Forest System Lands managed by the Helena-Lewis & Clark National Forest along the Smith River. The new graffiti that was scratched into the rock art panel consisted of "Soph R. 6/8/22" and measured approximately 11" x 9".

8.  On July 7, 2022, I was notified by Bodily of the vandalism and agreed to initiate an investigation.

9.  On July 7, 2022, I reviewed a group permit titled, "Smith River State Park and River Corridor Registration and Permit" that was within the period covered by the date included in the vandalism. Reviewing the permit, I discovered it had been filled out by Justin Field, PO Box 124, Milltown, Montana, with a launch date of June 7, 2022. The permit included the names Justin Field, Tyler Field, Bryan Harr (Agent Note: The handwriting on the last name was difficult to read and could also be Hacc, Hacr, or Harc), Maddy Habibi, and, "Sofia Ritatchka" all listed as Montana State residents.

10. On July 18, 2022, Bodily and I hiked into the location to assess the damage in person and document the vandalism. I photographed and measured the vandalism previously noted reading, "Soph R 6/8/22". The inscription measured approximately 11" X 9". The inscription was located on a cliff face that had multiple pictographs that Bodily explained were thousands of years old.

4

11. On July 19, 2022, I conducted a social media search and discovered accounts for a Sophia Ritachka, Habibi, Justin Field, and Tyler Field on Facebook and Instagram. On Facebook, Ritachka uses her full name and on Instagram her handle is sophiaritachka2. Her Facebook profile did not have any recent posts, however, her Instagram page had been updated regularly. Ritachka has 10,000 followers for her Instagram page and currently has 440 posts. On it I was able to discover multiple videos and pictures of her with Justin Field. Additionally, I discovered multiple pictures and videos of her, Tyler Field, Habibi, and Justin Field on the Smith River in Montana on various accounts. I know it was the Smith River because I recognized the unique features of the country. Additionally, many of the pictures were captioned with, "Smith River (Montana)" and, "SMITH RIVER FLOAT TRIP." I know it was Ritachka in the content because she was tagged by name.



While conducting this review, I discovered a still shot in a video posted to Justin Field's Instagram where Ritachka is clearly seen taking a, "selfie" style photograph with a device held in her left hand posing at the base of a cliff above the Smith River in a location consistent with a potential archeological site.



Additionally, I discovered multiple videos and pictures showing the group traveling to and posing outside of cave entrances consistent with archeological sites in the Smith River area.

12.   On July 26, 2022, I discussed the facts and circumstances of the case with USFS Patrol Captain Nick Scholz, Helena, Montana. I showed him the permit signed by Justin Field and Captain Scholz explained he knew Justin Field

personally from his time working as an LEO in Missoula, Montana. Captain Scholz contacted MFWP Warden Kyle Miller, Missoula, Montana, and explained the facts and circumstances of the investigation. Officer Miller said he believed Justin Field was dating a woman name Sophia who was from California. He also said he believed she was working for the USFS.

13. On July 28, 2022, I was able to identify Ritachka as a temporary employee working with the USFS out of Missoula, Montana, as a Survey Technician GS-5 Step 1 through searching an online database of all personnel employed by the USFS.

14. I requested a damage assessment and site analysis from Bodily to assist with the criminal investigation. On July 29, 2022, Bodily provided an estimated cost for hiring a specialist to conduct restoration and repair work and itemized expenses to a total amount of $25,855.59. Additionally, he provided the following summary of the site's archeological and cultural significance.

> The Archaeological Resources Protection Act (ARPA) of 1979 states that, "the term "archaeological resource" means any material remains of past human life or activities which are of archaeological interest … at least 100 years of age" (16 USC 470bb(1)). In the ARPA Uniform Regulations, the term "material remains" is defined as, "… physical evidence of human

habitation, occupation, use, or activity, including the site, location, or context in which such evidence is situated" (36 CFR 296. 3(a)(2)). The ARPA Uniform Regulations state that, "'Of archeological interest' means capable of providing scientific or humanistic understandings of past human behavior, cultural adaptation, and related topics through the application of scientific or scholarly techniques such as controlled observation, contextual measurement, controlled collection, analysis, interpretation and explanation" (36 CFR 296. 3(a)(1)). The Canyon Mouth Site (24ME0341) is an archaeological site that was initially documented by John and Mavis Greer in 1993 (Greer 1993). It is a site that contains two panels of pictographs located along the west side of the Smith River approximately 30 miles northwest of White Sulphur Springs, Montana. The pictographs are painted on a limestone cliff at the confluence of Black Canyon and the Smith River. Panel #1 faces the Smith River and Panel #2 faces Black Canyon. The pictographs are painted with red, orange, and purple pigment and are fairly faded with some natural spalling occurring. Panel #1 is where the graffiti occurs, and this panel consists of a red right-hand handprint and multiple red pigment smears that have weathered to the point that they are indecipherable. The graffiti is located on Panel #1. Panel #2 contains pictographs that are in better condition that those on Panel #1. Here, the

8

majority of the pictographs are decipherable and consist of multiple motifs that include what appears to be a possible mask/anthropomorph/zoomorph/bear (Motif J), arrows with fletching, knife, bird-like footprints, circles, bear-like paw prints, and a possible upright standing anthropomorph/zoomorph. The site has not been archaeologically tested to determine dates, but any archaeologist can attest to them being hundreds to thousands of years old based on style, fading, weathering, lichen growth, and calcite deposition. Research indicates that rock art in the Smith River drainage dates from the Late Archaic Period (1000 B.C-A.D. 500) to the Late Prehistoric Periods (A.D. 500-1750) (Greer 1995). This rock art site clearly exhibits human activity dating prior to 100 years ago that is of archaeological interest.

15.   As set forth in the preceding paragraphs, I submit that there is probable cause to believe Ritachka was responsible for the vandalism that occurred at the archeological site located at the intersection of Black Canyon and the Smith River and that the Device contains evidence of this violation. The inscription showed, "Soph R. 6/8/22." When I went and reviewed the permits that were issued during the time of June 8, 2022, I discovered the permit filled out by Justin Field including a, "Sofia Ritatchka." Through social media, I was able to confirm that

9

Justin Field traveled on the Smith River with Ritachka on June 8, 2022. Through multiple pictures and videos, I was able to confirm Ritachka traveled to and documented visiting multiple caves consistent with archeological sites in the Smith River area. Finally, I was able to discover a picture taken by Ritachka with a device in her left hand while visiting a site at the base of the cliffs on the Smith River. Based on these facts, I submit there is probable cause that evidence of violations of 16 U.S. Code § 470ee (a) Unauthorized excavation, removal, damage, alteration, or defacement of archaeological resources will be found in the Device. I expect to discover the following types of evidence on the device.

    a. Based on my training and experience, people that are prolific on social media tend to take high numbers of photographs and videos of their activities before selectively narrowing that number to a few favorite images and videos to post on social media. Reviewing Ritachka's Instagram, I was able to discover that she has a very large following and posts pictures and videos almost exclusively of outdoor activities. This trip on the Smith River is consistent with the type of activity she would document. This combined with the picture I discovered of her taking a selfie with a device in her hand indicate there will be pictures and videos of her and her group during their

Smith River trip on the Device. Additionally, I discovered multiple pictures and videos on social media accounts belonging to the other group members on the trip where Ritachka was photographed or filmed in areas consistent with archeological sites on the Smith River. These factors indicate there will be evidence of Ritachka visiting archeological sites on the Device.

b. Based on my training and experience, cellular devices often keep a historical log of GPS locations. This GPS signal is frequently available even in areas with no cell phone service. Photographs and videos taken in remote locations will likely contain GPS data allowing investigators to determine a subject's path of travel and link them to a particular event.

c. Based on my training and experience, groups text to plan trips before the event and will text to discuss the trip after the fact. These texts will frequently include photographs. Based on the fact that there are multiple people in the group that floated the Smith River together, I submit there is probable cause to believe that there will be evidence in the form of text messages discussing the details of the trip before and after the event.

## TECHNICAL TERMS

16.     Based on my training and experience, I use the following technical terms to convey the following meanings:  Wireless Telephone, cellular phone, or smartphone:  A wireless telephone (or smartphone, mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet using a browser or other applications.  Wireless telephones may also include global positioning system ("GPS") technology for determining location of the device.

17.     Based on my training, experience, and research, I know that the Device has capabilities that allows it to serve as wireless telephones or

12

smartphones, digital cameras, portable media players, GPS navigation devices, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed the device.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

18. It is not possible to determine, merely by knowing the smartphone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Smartphone devices today can be simple cellular telephones and text message devices, and/or they can include cameras, serve as personal digital assistants and have functions such as calendars and full address books, and/or they can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "airplane mode," which disables access to the network. Unlike typical computers, many smartphones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some smartphone

models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive.

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, items that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. Based on the foregoing, and consistent with Fed. R. Crim. P. 41(e)(2)(B), I seek permission for an agent review of the device as well as the forensic examination of the device consistent with the warrant. The examination will require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

21. In searching the data stored on the device, law enforcement personnel executing this search warrant will employ the following procedure:

a. The team searching the device will do so only by using search protocols specifically chosen to identify only the specific items to be seized described in Attachment B.

b. The team may subject all of the data contained in the device or the forensic copy to the protocols to determine whether the device and any data falls within the items to be seized described in Attachment B. The team searching the device may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to the protocols, whether the data falls within the list of items to be seized described in Attachment B.

c. These search protocols also may include the use of tools to exclude normal operating system files and standard third-party software that do not need to be searched.

d. When searching the device pursuant to the specific search protocols selected, the team searching the device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

e. If the team searching the device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f. At the conclusion of the search of the device, any one device determined to be itself an instrumentality of the offense(s) and all the data thereon shall be retained by the United States until further order of the Court or one year after the conclusion of the criminal case/investigation.

15

g.  Notwithstanding, after the completion of the search of the device, the United States shall not access digital data falling outside the scope of the items to be seized in this warrant on any retained device or digital data absent further order of Court.

h.  If the search team determines that a device is not an instrumentality of any offense under investigation and does not contain any data falling within the list of items to be seized described in Attachment B, the United States will as soon as practicable return the device and delete or destroy all the forensic copies thereof.

i.  If the search determines that the device or the forensic copy is not an instrumentality of any offense under investigation but does contain data falling within the list of the items to be seized described in Attachment B , the United States either (i) within the time period authorized by the Court for completing the search, return to the Court for an order authorizing retention of the device and forensic copy; or (ii) retain only a copy of the data found to fall within the list of the items to be seized described in Attachment B and return the device and delete or destroy all the forensic copies of the device.

## CONCLUSION

22. Based on the forgoing, I request that the Court issue the proposed search warrant. I believe there is probable cause to conclude that the Device, cellular telephone Verizon (530) 739–8909 belonging to Sophia Ritachka to be seized during the suspect interview with Ritachka on August 26, 2022, contains evidence of violations of 16 U.S. Code § 470ee (a) Unauthorized excavation, removal, damage, alteration, or defacement of archaeological resources

23. I submit there is probable cause to believe that a search of the items described in Attachment A will provide other evidence of crimes including, but not limited to, location information, videos and photographs of Ritachka in and around archeological sites on the Smith River, and records or communications about Ritachka's Smith River trip as provided in Attachment B.

Respectfully submitted,

*Matthew Burningham*
Matthew Burningham
Special Agent
United States Forest Service

Attested to by the applicant in accordance with the requirements of Fed. R. Crim P. 4.1 by being subscribed electronically and sworn to telephonically.

_____
TIMOTHY J. CAVAN
UNITED STATES MAGISTRATE JUDGE

17